UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

WILLIAM ALVAREZ,

                          Plaintiff,

    -against-                                        9:22-CV-00186 (LEK/ATB)

CALEB BAUSE, *et al.*,

                          Defendants.

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

Plaintiff William Alvarez commenced this action on February 28, 2022. Dkt. No. 1. Plaintiff later filed an amended complaint on March 29, 2022, pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging claims against Correctional Officers ("C.O.") Caleb Bause; Skyler Tuttle; Anthony Farina; Michael Babicz; and Sergeant Glenn Trombly (collectively, "Defendants") for violations of Plaintiff's Eighth Amendment, First Amendment, and Fourteenth Amendment rights arising out of his confinement at Marcy Correctional Facility ("Marcy C.F."). Dkt. No. 12 ("Amended Complaint").

Now before the Court is Defendants' partial motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) regarding Plaintiff's claims arising under the Right to Intimate Association and Fourteenth Amendment Due Process Clause; Defendants also request a fourteen-day extension to file an answer in response to Plaintiff's Amended Complaint. Dkt. No. 14 ("Motion"). For the reasons set forth below, Defendants' Motion is denied in part and granted in part.

**II.    BACKGROUND**

The following facts, which the Court assumes to be true at this stage, are taken from the

Amended Complaint. See Vega v. Hempstead Union Free School Dist., 801 F.3d 72, 76 (2d Cir. 2015).

At all times relevant to this action, Plaintiff was confined at Marcy C.F. Am. Compl. ¶ 2. On September 25, 2020, Plaintiff and Bause "engaged in an acrimonious verbal exchange" related to Bause's instruction that Plaintiff must stop talking or lower his voice. Id. ¶ 22. Later that day, Bause ordered Plaintiff to clean the floors of the bathroom showers. Id. ¶ 23. While Plaintiff was cleaning the bathroom shower area, Bause called out Plaintiff's name, but Plaintiff did not respond. Id. ¶ 24. Bause repeated his call to Plaintiff, and this time, Plaintiff turned around. Id. ¶ 25. When Plaintiff turned around, Bause suddenly discharged "chemical spray" in Plaintiff's face. Id. ¶ 26. After Bause sprayed Plaintiff, Plaintiff ran out of the bathroom toward "the main dorm area" of the prison to avoid any further attack from Bause, and to position himself where others could witness what Bause was doing to Plaintiff. Id. ¶ 27. Afterward, Bause followed Plaintiff into the main dorm area, and ordered the other inmates to return to their sleeping quarters. Id. ¶ 28. Bause then ordered Plaintiff to step into a vestibule located at the entrance of the dorm, id., and although Plaintiff complied with the order, Bause activated his personal alarm system which summoned other officers to respond to the scene. Id. ¶ 29.

In response to Bause activating his personal alarm, Tuttle, Farina, Babicz, and Trombly arrived in the vestibule. Id. ¶ 30. When the other officers arrived on the scene, Bause explained that he had activated his personal alarm because Plaintiff—who now had his hands up against the wall—had attacked Bause. Id. ¶ 31. In response to Bause's statement, Tuttle slammed Plaintiff's head against the wall several times, and then handcuffed Plaintiff. Id. ¶ 32. Once Tuttle handcuffed Plaintiff, the officers repeatedly kicked Plaintiff in the head and body. Id. ¶ 33.

Although Plaintiff could not identify which officers kicked him, none of the Defendants intervened to stop the kicks. Id. ¶ 34.

Soon thereafter, Plaintiff "was dragged into a van" and transported to the prison infirmary. Id. ¶ 35. Tuttle, Farina, and Trombly accompanied Plaintiff in the van. Id. ¶ 36. During the trip to the infirmary, Tuttle punched Plaintiff several times, while Farina and Trombly declined to intervene or "stop the beating." Id. ¶ 37. Once the van arrived at the infirmary, Trombly said to Tuttle, "[t]hat's enough," whereupon the beating stopped immediately. Id. ¶ 38. Because of these "beatings," Plaintiff suffered fractures to his face which required surgical repair, and resulted in Plaintiff suffering "a permanent facial deformity." Id. ¶ 39.

On September 25, 2020, Plaintiff was enrolled in and had nearly completed a Comprehensive Alcohol and Substance Abuse Treatment program ("CASAT") at Marcy C.F. Id. ¶ 40. CASAT is a program where inmates receive intensive substance abuse treatment with the goal of early release and "reintegration from prison into the outside community." Id. ¶ 41. Because Plaintiff was on track to complete the CASAT program and exhibited good behavior during his incarceration, Plaintiff was likely to be released from prison before the end of 2020. Id. ¶ 42.

Plaintiff was especially motivated to complete the CASAT program and obtain his early release to reunite with his then-two-year-old daughter, who was diagnosed with and being treated for retinoblastoma, a malignant cancer of the eyes. Id. ¶ 43. Prior to Plaintiff's incarceration, he lived with his daughter. Id.

At all times relevant to this action, Plaintiff alleges that Bause was aware of the following facts: (1) Plaintiff's daughter was diagnosed with and being treated for cancer; (2) Plaintiff's prospective early release date from prison; (3) and Plaintiff's desire to successfully complete his

CASAT program and be released to care for his daughter. Id. ¶ 44. Plaintiff specifically expressed to Bause his desire to be released early multiple times. Id.

After the use of force incident in the Marcy C.F. dorm, Plaintiff asserts that Bause authored a misbehavior report in which he knowingly and falsely accused Plaintiff of attacking him in the bathroom shower area without provocation. Id. ¶ 45. The misbehavior report falsely charged Plaintiff with "Assault on Staff," "Violent Conduct," and "Refusing Direct Order." Id. ¶ 46. Bause also wrote that Plaintiff "started running towards me aggressively and with a closed left fist and struck me in the right side of my face and chest area." Id.

Because of the false misbehavior report, Plaintiff was required to appear "at a Tier Hearing" to adjudicate the charges that Bause filed against him. Id. ¶ 47. At the hearing, Bause repeated his false allegations by testifying that inside the bathroom shower area, Plaintiff attacked Bause without provocation. Id. ¶ 48. Plaintiff states that Bause was aware that his false accusations would likely result in Plaintiff being found guilty of some or all of the charges made in the misbehavior report, discharged from the CASAT program, and deprived of the opportunity to be released early from prison and care for his daughter. Id. ¶ 49. Ultimately, because of the false misbehavior report and testimony at the Tier Hearing, Plaintiff was found guilty of all administrative charges. Id. ¶ 50. Plaintiff was subjected to various forms of punishment, including confinement to the prison's Special Housing Unit ("SHU") for sixty days, which was tantamount to solitary confinement. Id.

Before Plaintiff was in SHU, he had been in daily telephone contact with his daughter's healthcare providers to monitor her medical condition. Id. ¶ 51. However, while in SHU, Plaintiff was denied access to and prohibited from being in telephone contact with the healthcare

4

providers. Additionally, Plaintiff was subjected to unprovoked harassment by correctional officers. Id. ¶ 52.

Another consequence of the false charges against Bause included being discharged from the CASAT program. Id. ¶ 53. This discharge resulted in Plaintiff (1) losing his opportunity to complete the program; (2) being denied early release; (3) being transferred to Great Meadow Correctional Facility—a maximum-security prison; and (4) being denied the opportunity to tend to the care and custody of his daughter. Id. ¶ 53. Plaintiff remained incarcerated until June 25, 2021. Id. ¶ 54. Similarly, because of the false misbehavior report and accompanying punishment, Plaintiff's relationship with his daughter was adversely affected and Plaintiff was unable to provide the emotional and "other support" he would have provided had his release not been delayed. Id. ¶ 55. Furthermore, because of the delay in Plaintiff's release, the medical care and treatment Plaintiff's daughter needed became delayed, and was "thereby adversely affected." Id.

## III. STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a Plaintiff. See Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Id. at 556.

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Where the well-pleaded facts do not permit a court to infer more than the mere possibility of the alleged misconduct, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. See Iqbal, 556 U.S. at 678–79.

## IV. DISCUSSION

Defendants argue that Plaintiff's claims must be dismissed because (1) Plaintiff's Fourteenth Amendment Due Process claim is "based solely on allegations of a false disciplinary charge;" (2) Plaintiff lacks a liberty interest sufficient to warrant Fourteenth Amendment protections; and (3) Plaintiff's Intimate Association claim fails as a matter of law. Mot. at 3–12. Defendants also seek a fourteen-day extension to file an answer from the issuance of this Memorandum-Decision and Order. Id. at 12–13.

### A. Constitutional Right to Intimate Association Claim

The Constitution protects "certain kinds of highly personal relationships." Roberts v. United States Jaycees, 468 U.S. 609, 618 (1984). The Supreme Court "has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the [substantive component of the] Due Process Clause of the Fourteenth Amendment." Moore v. City of East Cleveland, Ohio, 431 U.S. 494, 499 (1977) (collecting cases). At the same time, the Supreme Court has also determined that "in certain circumstances," the First Amendment also "embraces" "intimate association" and "expressive association." City of Dallas v. Stanglin, 490 U.S. 19, 23–24 (1989) (citing Roberts, 468 U.S. at 617–18). Thus, it appears that

the Right to Intimate Association emanates from both the substantive component of the Fourteenth Amendment Due Process Clause and the First Amendment Right to Association.

The Second Circuit has acknowledged that there is some ambiguity concerning the Right to Intimate Association. See Adler v. Pataki, 185 F.3d 35, 42 (2d Cir. 1999) ("The source of the intimate association right has not been authoritatively determined."). Nevertheless, "the relationships that have been recognized as entitled to protection under either Amendment are 'distinguished by such attributes as smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship[.]'" Piscottano v. Murphy, 511 F.3d 247, 278 (2d Cir. 2007) (citing Roberts, 468 U.S. at 620)). Indeed, "[a]mong the factors to be considered are 'size, purpose, policies, selectivity, [and] congeniality.'" Piscottano, 511 F.3d at 278 (quoting Roberts, 468 U.S. at 619) (alterations in original). Relationships that "exemplify" constitutionally protected intimate associations "are those that attend the creation and sustenance of the family" including "marriage," "childbirth" "the raising and education of children," and "cohabitation with one's relatives." Piscottano, 511 F.3d at 278 (quoting Roberts, 468 U.S. at 619).

Thus, "where a governmental regulation substantially interferes with close familial relationships, the most exigent level of inquiry—strict scrutiny—is applied." Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of New York, 502 F.3d 136, 143 (2d Cir. 2007) (citing Zablocki v. Redhail, 434 U.S. 374, 388 (1978)). Strict scrutiny applies to statutes and regulations, as well as *actions* by individual governmental defendants that infringe on close familial relationships. See Brown v. Maher, 597 F. Supp. 3d 541, 547 (N.D.N.Y. 2022) ("[P]laintiff's right to live with his wife is a fundamental one. [The parole officers'] restriction must therefore survive strict scrutiny."); Marquez v. Annucci, No. 20-CV-1974, 2020 WL

7

3871362, at *6 (S.D.N.Y. July, 9 2020). "By contrast, where the associational interest claimed by the plaintiff is of less importance, and where the regulation challenged interferes only minimally with the associational freedom, the state's justification for the regulation need not be as weighty." City Univ. of New York, 502 F.3d at 144 (quoting Zablocki, 434 U.S at 386)). Only when a regulation or action by a government "directly and substantially interferes" with a fundamental right is strict scrutiny appropriate. See Lyng v. Castillo, 477 U.S. 635, 638–39 (1986) (declining to apply strict scrutiny to a statutory classification of a federal food stamp program because the classification "probably has no effect at all" on the alleged fundamental right at issue); see also Quiroz v. Short, 85 F. Supp. 3d 1092, 1109 (N.D. Cal. 2015) ("In order to implicate a fundamental right, such as the right to intimate association, plaintiff must demonstrate that the defendant's actions directly and substantially impaired that right.") (citations omitted).

But other concerns must be weighed in the prison context. "[F]reedom of association is among the rights least compatible with incarceration . . . Some curtailment of that freedom must be expected in the prison context." Overton v. Bazzetta, 539 U.S. 126, 131 (2003). The Supreme Court has nevertheless cautioned: "We do not hold, and we do not imply that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners." Id. Thus, the Supreme Court left the door open to prisoners asserting Freedom of Intimate Association claims, but it declined to elucidate the contours of the right in the carceral context. Id. at 131–32 ("We need not attempt to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration because the challenged regulations bear a rational relation to legitimate penological interests."). Consequently, because the Right to Intimate Association is not terminated by incarceration or

"irrelevant to claims made by prisoners," 539 U.S. at 131, the Court will proceed to the merits of Plaintiff's Right to Intimate Association claim.

At the outset, the Court in unaware of any case law in the Second Circuit addressing the boundaries of the Right to Intimate Association for inmates. The few cases discussing the Right to Intimate Association occurred outside the prison context and did not deal with relationships between parents and children. See, e.g., Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 55–62 (2d Cir. 2014) (granting qualified immunity after determining that a relationship with a fiancée was not clearly established under the right to intimate association); City Univ. of New York, 502 F.3d at 144 (reversing the grant of a preliminary injunction against a university because the fraternity's Right to Intimate Association did not warrant strict scrutiny or the equitable relief sought by the plaintiffs); see also Poirier v. Massachusetts Dept. of Corr., 558 F.3d 92, 96 (1st Cir. 2009) ("The threshold question in this case is what level of scrutiny should be applied to the type of intimate association Poirier seeks to protect. The unmarried cohabitation of adults does not fall under any of the Supreme Court's bright-line categories for fundamental rights in this area, and we decline to expand upon that list to include the type of relationship alleged here.") (internal citations omitted).

Although the Second Circuit has not fashioned a test regarding the Right to Intimate Association in the prison context, it has crafted a relevant test outside the prison context. See City Univ. of New York, 502 F.3d at 144. In City Univ. of New York, a fraternity sued a university over the university's anti-discrimination policy, claiming that the policy violated the fraternity's Right to Intimate Association. Id. The Second Circuit reversed the district court's "categorical approach" to evaluating the claim. The approach employed by the district court asked whether "the policy affected a constitutionally protected liberty or . . . not." Id. The

Second Circuit found this approach "inappropriate," because it "fail[ed] to account for the broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the state." Id. (cleaned up). Consequently, the Second Circuit explained: "Rather, the question is: Upon balancing of all pertinent factors, do the state's interests, and its means of achieving them, justify the state's intrusion on the particular associational freedom?" Id.

Accordingly, in evaluating Right to Intimate Association claims, courts must balance the strength of the associational interest against the degree of state interference. Id. at 143–45. If for instance, the state intrusion substantially interferes with a close familial relationship, strict scrutiny applies, and the question becomes: Is the State's interference narrowly tailored to serve a compelling governmental interest? See id. at 143.

The Court is aware of one instance where a court evaluated what constitutes "substantial interference" in the context of an inmate asserting a Right to Intimate Association claim. See Quiroz, 85 F. Supp. 3d at 1097. That question was taken up by a district court in the Northern District of California. There, the defendant correctional officer allegedly enclosed two letters from the plaintiff in a single envelope to plaintiff's fiancée: one letter was intended for the plaintiff's fiancée, and the other was intended for a different woman. Id. By doing so, the correctional officer sought to alert the plaintiff's fiancée that the plaintiff was being unfaithful. The plaintiff alleged that in the defendant's attempt to expose his purported infidelity, his Right to Intimate Association was violated. Id. Although the court dismissed the claim predicated on the defense of qualified immunity, id. at 1109, it nevertheless reached the merits. Specifically, the court found that although the Right to Intimate Association was a fundamental right, id., strict scrutiny would be triggered only if the correctional officer's actions "directly and

substantially" impaired the plaintiff's right to intimate association. Id. Ultimately, the court found that sending a single letter to the plaintiff's fiancée to sabotage the plaintiff's relationship was insufficient to constitute direct and substantial interference with the plaintiff's Right to Intimate Association. The court reasoned that, "though defendant's actions certainly resulted in creating discord in plaintiff's relationship with [plaintiff's fiancée], there is no evidence that defendant's actions prevented, prohibited, or otherwise substantially burdened plaintiff from being able to associate with [his fiancée]." Id. (internal citations omitted).

In reaching its conclusion, the district court relied on the Supreme Court's decision in Lyng v. Int'l Union, United Auto, Aerospace & Agr. Implement Workers of Am., UAW, 485 U.S. 360 (1988). In that case, the Supreme Court applied rational basis review to a challenge to the Food Stamp Act. The Act prohibited a household from becoming eligible for food stamps if any member of the household went on strike. Id. at 362. The plaintiffs argued that the statute violated their associational rights as union members, but the Supreme Court disagreed. Id. at 364. It reasoned that there was no substantial and direct interference with the right to association because, "in the overwhelming majority of cases [the statute] probably has no effect at all," id. at 366 (citations omitted), and the statute also did not "prevent union members from associating together or burden their ability to so in any significant manner." Id. Consequently, the Court declined to apply strict scrutiny to the statute because it did not substantially and directly burden the plaintiffs' associational rights.

Moreover, in addressing Plaintiff's claim, the Court is mindful of Overton's statement that "some curtailment" of associational freedoms must be expected in prisons, but because the

Supreme Court declined to outline that curtailment, 539 U.S. at 131-32,[1] the Court will use the most applicable test provided by the Second Circuit, even if the test derived from outside of the prison context. As a result, the Court will use the Second Circuit's test from City Univ. of New York with the facts of Quiroz as a comparator given the factual similarities between this case and Quiroz. Accordingly, the Court will analyze the nature of the relationship between Plaintiff and his daughter,[2] and the degree of interference with that relationship by Bause as a State actor. Afterward, it will determine whether or not strict scrutiny applies to Plaintiff's claim.

First, the relationship here is between father and daughter. "The husband/wife and parent/child relationships are obviously among the most intimate . . . ." Patel v. Sears, 305 F.3d 130, 136 (2d Cir. 2002). As the Second Circuit has held: "The relationships that have been afforded the most vigorous protection include those involved in the 'creation and sustenance of the family'—namely marriage, the begetting, *raising, and education of children*, *and cohabitation with relatives*." City Univ. of New York, 502 F.3d at 144 (quoting Zablocki, 434 U.S at 386) (emphasis added); see also Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 520 (1990) (noting that "family" is "society's most intimate association").

---

[1] As discussed, the Supreme Court noted: "We need not attempt to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration." 539 U.S. at 131-32

[2] In City Univ. of N.Y., the Second Circuit analyzed several factors to address the associational strength of the plaintiffs including "size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship," id. at 145, because the plaintiffs were not family. However, because the intimacy here between parent and child—unlike between fraternity members—is well-settled as being among the most intimate, the Court need not weigh the factors to ascertain the intimacy and associational strength for the reasons stated in this section. Cf. Troxel v. Granville, 530 U.S. 57, 65 (2000) ("[t]he liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by th[e Supreme] Court."); Stanley v. Illinois, 405 U.S. 645, 651 (1972) ("The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection.").

Second, the degree of State interference is much greater here than in Quiroz. Unlike Quiroz, only a single letter without further action from the defendant was sent to the plaintiff's fiancée. Quiroz, 85 F. Supp. 3d at 1109.³ Sending a single letter absent some other act did not "prevent [the plaintiff] from choosing to associate" with his fiancée. Id. But here, Bause's decision to intentionally write a false misbehavior report that he knew would likely result in Plaintiff's further confinement, led to circumstances that halted Plaintiff's ability to care for and live with his ailing daughter by an additional six months. Am. Compl. ¶ 54. Indeed, because of the extra six months of confinement that Plaintiff did not anticipate serving, Bause's actions blocked Plaintiff from providing the emotional and "other support" to his daughter while she underwent cancer treatment that he could have otherwise provided if not for Bause. Id. ¶ 55. This finding also corresponds with Lyng's reasoning, where the Supreme Court declined to find substantial associational interference premised on the assertion that the governmental action there "in the overwhelming majority of cases . . . probably has no effect at all." 485 U.S. at 366 (cleaned up). But here by contrast, Bause's actions had the clear effect of prolonging Plaintiff's incarceration and plainly shutting the door on Plaintiff's ability to associate and care for his daughter by an additional six months. Additionally, Plaintiff plausibly pleads that Bause specifically intended to interfere with Plaintiff's relationship with his daughter. Am. Compl. ¶¶ 44, 49. See Gorman v. Rensselaer Cnty., 910 F.3d 40, 48 (2d Cir. 2018) ("[I]nfringement of the right to familial associations requires the allegation that state action was specifically intended to

---

³ This Court takes no position on whether a single instance of sending a letter to a prisoner's associate or family member may gave rise to a Right to Intimate Association claim. Although one instance was insufficient in the Quiroz court's analysis, the Supreme Court has never created a bright-line test to determine how many times someone's familial relationship must be interfered with before a Right to Intimate Association violation is found. See e.g., Roberts, 468 U.S. at 618; Moore, 431 U.S at 499.

interfere with the family relationship."). Accordingly, the Court finds that Bause "substantially interfere[d] with [a] close familial relationship." City Univ. of New York, 502 F.3d at 143. Because the Court has determined that Bause's actions substantially interfered with Plaintiff and his daughter's relationship and thus Plaintiff's Right to Intimate Association, the Court will apply "the most exigent level of inquiry—strict scrutiny. . . ." Id.[4]

When governmental action "interferes with core associational liberties, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." Id. (quoting Zablocki, 434 U.S. at 388) (internal quotations omitted). Here, Defendants do not offer any interests that would justify Bause's decision to author a false misbehavior report with the intent to prolong Plaintiff's incarceration to prevent Plaintiff from caring for his young daughter battling cancer. See generally Mot. The Court is unable to identify any such interest either. Consequently, the governmental action here fails under strict scrutiny and would also fail under rational basis review. Cf. Plyler v. Doe, 457 U.S. 202, 230 (1982) ("[The] denial must be justified by showing that it furthers some substantial state interest. No such showing was made here."). Accordingly, Defendants' motion to dismiss Plaintiff's Right to Intimate Association claim is denied.

### B. Fourteenth Amendment Substantive Due Process Claim

---

[4] As discussed above, although strict scrutiny is often applied to specific policies or statutory schemes, see City Univ. of New York, 502 F.3d at 143; Zablocki, 434 U.S. at 388, the Court finds it equally appropriate to apply strict scrutiny to Bause's actions because he is a governmental actor, irrespective of whether there was an official policy related to his actions. Indeed, in Quiroz, the court was prepared to apply strict scrutiny to a correctional officer's decision to interfere with the personal life of an inmate had the interference been more substantial and direct, absent an official policy regulating the correctional officer's specific action. Quiroz, 85 F. Supp. 3d at 1109–10. Similarly other courts in this Circuit have applied strict scrutiny to discrete actions by governmental individuals when those actions interfere with fundamental rights. Maher, 597 F. Supp. 3d at 547; Marquez, 2020 WL 3871362, at *6.

"The Fourteenth Amendment guarantees 'more than fair process'; it 'cover[s] a substantive sphere as well, baring certain government actions regardless of the fairness of the procedures used to implement them.'" Hurd v. Fredenburgh, 984 F.3d 1075, 1087 (2d Cir. 2021) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 840 (1998)). "Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." Hurd, 984 F.3d at 1087 (quoting Southerland v. City of New York, 680 F.3d 127, 151 (2d Cir. 2012)).

The Second Circuit has stated that, "The first step in substantive due process analysis is to identify the constitutional right at stake." Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995). Next, plaintiffs "must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Hurd, 984 F.3d at 1087 (quoting Southerland, 680 F.3d at 151–52). Finally, "[t]he interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." Hurd, 984 F.3d at 1087 (quoting Southerland, 680 F.3d at 151–52). Furthermore, government action that is merely "incorrect or ill-advised does not" does not rise to the level of a violation of substantive Due Process. Kaluczky, 57 F.3d at 211.

As discussed above, the constitutional right at stake in this case is the Right to Intimate Association. The Court notes, however, that Defendants misstate the standard applicable to Substantive Due Process violations. Defendants argue that Bause's actions did not violate *procedural* Due Process. See generally Mot. However, Substantive Due Process and Procedural Due Process are distinct analyses. See Martin v. Prof'l Staff Cong. Local 2334, 432 F. Supp. 3d

15

367, 388-89 (S.D.N.Y. 2020) (noting the distinction between procedural and substantive due process).

The facts of this case are similar to those in Hurd v. City of New York, where an inmate alleged that a prison intentionally held him past his conditional release date without justification. No. 18-CV-3704, 2019 WL 4696364 (E.D.N.Y. Sept. 26, 2019), aff'd but criticized on other grounds sub nom. Hurd v. Fredenburgh, 984 F.3d 1075 (2d Cir. 2021). Specifically, the plaintiff argued he was entitled to conditional release because of the jail time credits he earned, but the defendants, without explanation, declined to release him, and as a result, the plaintiff remained confined. Id. at *2. The plaintiff argued that this deprivation of his conditional release violated his Substantive Due Process Rights. Id. at *5. The court there ultimately found that the plaintiff did not demonstrate a violation of another constitutional right as required under the Due Process analysis, but it did note, "Although the court finds if true, plaintiff's allegations that [the defendant] *intentionally* took actions to keep plaintiff imprisoned without justification might shock the judicial conscience, plaintiff has failed to satisfy the first pleading requirement for a substantive due process claim." Id. (emphasis in original).

Conversely, in Bowman v. City of Middletown, a district court in this Circuit declined to find a Substantive Due Process violation when a pretrial detainee alleged that he was cuffed and shackled in response to filing a written complaint against prison staff. See 91. F. Supp. 2d 644, 665 (S.D.N.Y. 2020). The court reasoned that the defendant "provided a legitimate reason" for the shackling, and the plaintiff "fail[ed] to adduce evidence suggesting that there was no logical nexus between the restrictions placed upon him and the prison's interest in security." Id.

Here, the Court finds this case more analogous to Hurd. Like Hurd, Plaintiff alleges that Bause took "intentional" steps to keep Plaintiff confined in prison by sabotaging his completion

16

of the CASAT program. Am. Compl. ¶ 57. Additionally, according to Plaintiff, Bause knew of Plaintiff's daughter's cancer diagnosis and ongoing treatment, and nonetheless took steps to impede Plaintiff's potential early release and accompanying care for his daughter. Id. ¶ 44. While the Court is mindful of the Supreme Court's practice of "affording considerable deference to the determinations of prison administrators, who in the interest of security, regulate the relations between prisoners and the outside world," Thornburgh v. Abbott, 490 U.S. 401 407–08 (1989), Bause provides no justification or penological interest furthered by the actions alleged by Plaintiff. See generally Mot. As a result, the Court agrees with the logic animating Hurd, and finds that Plaintiff plausibly alleges that Bause "intentionally took actions to keep [P]laintiff imprisoned without justification," by impeding the possibility of his release and thus interfering with his daughter's cancer treatment and the accompanying cohabitation between them. Hurd, 2019 WL 4696364, at *5. This allegation thereby "shock[s] the judicial conscious" in violation of the protections afforded under the Due Process Clause. Id. Accordingly, Defendants' motion to dismiss Plaintiff's Due Process Clause claim is denied.

### C. Extension of Time to Answer Plaintiff's Amended Complaint

Finally, Defendants request that "the Court exercise its broad discretion to order a stay of time to answer the Amended Complaint until 14 days after a final determination is issued with respect to this motion." Mot. at 12. Defendants argue that granting this request would "conserve both the parties' and the Court's resources." Id.

The Court is unaware of any decisions by the Second Circuit addressing whether the filing of a partial motion to dismiss automatically delays a defendant's requirement to answer a complaint's remaining claims. However, one court in this Circuit addressing this question opted to automatically extend the defendants' time to file an answer in such a scenario. Bus. Incentives

17

Co. v. Sony Corp. of Am., 397 F. Supp. 63, 64–64 (S.D.N.Y. 1975) (noting that defendant's time to answer on all counts was automatically extended by its motion to dismiss seven counts).; see also Brocksopp Engineering, Inc. v. Bach-Simpson Ltd., 136 F.R.D. 485, 486 (E.D. Wisc. 1991) ("[A] partial 12(b) motion enlarges the time to file an answer."). The Court agrees with the reasoning of these courts and finds that Defendants should be afforded extra time to file an answer. Accordingly, the Court grants Defendants' request; Defendants will have fourteen (14) days to file an answer to Plaintiff's Amended Complaint from the issuance of this Memorandum-Decision and Order.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Partial Motion to Dismiss (Dkt. No. 14) is **DENIED** to the extent it sought dismissal of Plaintiff's Right to Intimate Association and Substantive Due Process Claims; and it is further

**ORDERED**, that Defendants' Partial Motion to Dismiss (Dkt. No. 14) is **GRANTED** to the extent it sought a fourteen (14) day extension to file an answer to Plaintiff's Amended Complaint; and it is further

**ORDERED**, that Defendants shall have **fourteen (14) days** from the issuance of this Memorandum-Decision and Order to file an answer; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: February 2, 2023
Albany, New York

LAWRENCE E. KAHN
United States District Judge